# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE
# WINCHESTER

|  |  |  |
|---|---|---|
| CASTA BRICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF TULLAHOMA, TENNESSEE | ) | |
| | ) | Case No. _____ |
| | ) | **JURY DEMANDED** |
| Defendant. | ) | |
| | ) | |

---

# COMPLAINT

---

Plaintiff, Casta Brice, files this Complaint against the City of Tullahoma, Tennessee. She shows:

## I. INTRODUCTION

1. This case involves *extreme* retaliation and cruelty by the City of Tullahoma against Casta Brice, its Human Resources Director of 26 years.

2. In 2020, Casta Brice restricted Kurt Glick, the Director of the City's Parks and Recreation Department, from including his handpicked choice of an *unqualified,* white male, drinking-buddy from Buffalo Wild Wings to be interviewed for a full-time position.

3. Glick became angry, arguing that his drinking buddy was excluded because he was an older *white male.* In truth, the drinking buddy was excluded because he was obviously *unqualified*

by comparison: based on his own application, he lacked the relevant work experience for the position while other applicants had the job experience.

4.     With concerns of cronyism and discrimination in Glick's Department, Ms. Brice and Ms. Jennifer Moody, City Administrator, initiated an investigation into Glick's practices. An outside law firm (Wimberly Lawson) confirmed that Glick did, in fact, possess a retaliatory streak and he did, in fact, use cronyism as a hiring practice, putting the City at financial risk.

5.     Glick was enraged at the result.  He retired and would go on to file a federal lawsuit against the City, a suit which Ms. Brice also opposed with her testimony.  In 2022, when Glick was elected to the Board of Alderpersons, he made it his mission to *get even* with Ms. Brice.  Aided by a hopelessly dysfunctional majority, the Board has delivered unconscionable harm to Ms. Brice: suspending her without investigation, then terminating her employment.

## II. PARTIES, JURISDICTION, VENUE

6.     Casta Brice is a female citizen and resident of Franklin County who is an ethnic minority.

7.     The City of Tullahoma, Tennessee is a governmental entity that employed Ms. Brice.

8.     Jurisdiction is proper under 42 U.S.C. §1981 and §1983, the First Amendment, the Constitutional right to equal protection of the law under the Fourteenth Amendment, and 28 U.S.C. §1331.  The Court has supplemental jurisdiction over claims under the Tennessee Human Rights Act. Tenn. Code Ann. §4-21-101 et. seq.

9.     Venue is proper in this Court under 28 U.S.C. §1391 as the cause of action accrued in Coffee County (within this judicial district) and the District may be found in this judicial district.

### III. FACTS

10.     Casta Brice, Plaintiff, is a female who is of a racial and ethnic minority. She is multi-racial, her mother from the Dominican Republic, her father from the Isle of St. Maarten. Ethnically, she is Spanish.

11.     Ms. Brice served as the long-term Human Resources Director for the City of Tullahoma. The City hired her in 1997, promoted her to Human Resources Director, and she served the City with strong performance evaluations through a tenure of more than 26 years.

#### *The All-White Full-Time Parks and Recreation Department's Hiring Practices*

12.     By 2020, Kurt Glick, an older white male, had been the long-time Director of the City's Department of Parks and Recreation. The Department bore his imprint, Glick working in the Department approximately thirty-five years.

13.      Until 2018, Glick's chain-of-command involved reporting to his very close friend, Mr. Jody Baltz, the City Administrator. But Baltz retired and, in July of 2018, he was replaced by a new City Administrator, Ms. Jennifer Moody.

14.     By 2020, under Glick's watch, the Tullahoma Parks and Recreation Department did not employ any racial minorities in full-time positions. Ms. Moody, together with Ms. Brice, had concerns that Glick's department operated largely by cronyism with insufficient regard to merit and qualification. This problem came into sharp relief in September of 2020.

15.     In September of 2020, the City posted an open position of "Program Coordinator" within Glick's Department of Parks and Recreation. This position, sometimes referred to as "Athletics Coordinator," involved an emphasis on the athletic leagues for youths and adults in the

City. Preferred requirements for the position included "[a] college degree in Recreation Administration or related field."

16. Consistent with his past involving cronyism over merit qualifications, Glick favored his white male "bar buddy" at Buffalo Wild Wings, an older white man named Jon Slater. As Glick himself would state under oath, he championed Slater based on their bar-talk while watching sports together: "[I]n talking with [Slater], he had a vast knowledge of athletics and sports."

17. But bar talk is not *vocational experience*, and Slater was an accountant by vocation. In fact, the only *athletic* qualification Slater possessed was that of a student-worker at Ole Miss approximately twenty years ago. Nonetheless, Glick advocated for Slater and made known his preference to Fire Chief Shasteen whom Glick had asked to serve on the selection committee.

18. That Slater was not *qualified* was easily and objectively determined through his application.[1] Lacking the necessary *qualifications,* Ms. Brice, the Human Resources Director, removed Slater from the interview slate. Obviously, being a bar-buddy and talking good sports just did not cut it. By comparison, other candidates had applications that *did* meet the professional and preferred criteria for the Program Coordinator position. Those included highly qualified persons by education and work history—including a person with a Master's degree in Recreation, Sport & Tourism and a person with a Bachelor's degree in Sports & Recreation Management.

19. This action of removing Slater infuriated Glick. He was *accustomed* to using unchecked cronyism in his department as the key criterion. But without Mr. Baltz, two women, one

---

[1] "To assess the qualification prong of the prima facie test, we focus on the plaintiff's objective qualifications. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003) (en banc). Generally, that means considering things like the plaintiff's education, *experience*, and whether he or she possesses required skills. *Id.* at 576." *Hammond v. Sysco Corp.*, 2023 U.S. App. LEXIS 34071, *14 (6th Cir. 2023)

a racial/ethnic minority and Human Resources Director, and the other the new Chief Administrator, had overruled his cronyism. *How dare they.*

### Glick Injects Race and Age as Proxy for Lack of Qualification

20.     As Glick saw it, the removal of Slater, an older white male, was a *racial and ageist* act. By not accepting the *qualification* aspect, Glick took it very personally. He too, was an older white male championing another older white male.

21.     Glick refused to accept that, *regardless of race or age,* Slater lacked the necessary qualifications in a merit-based, objective hiring system. He ignored the strong historical evidence of how his use of cronyism risked a "disparate impact," *unintentional* discrimination. Glick's entire department consisted solely of full-time white persons. To Ms. Brice's knowledge, Glick had never hired a person of minority-race to a full-time position.

22.     Ms. Brice, as the Director of Human Resources, was responsible for Risk Management issues, ensuring the City avoided both disparate treatment and disparate impact discrimination. In fact, in November of 2020, she won the 2020 Excellence in Risk Management Award from Public Entity Partners, the insurer who actually handles risk for the City of Tullahoma.

23.     Facing these risks and a formal employee complaint, Ms. Brice, along with Ms. Moody, initiated an investigation into Glick's practices. They advised Glick that the Parks and Recreation Department would undergo a review for internal compliance involving merit-based selections. The investigation specifically included: (1) the subject of retaliatory decision-making by Glick; and (2) any racial impact of Glick's hiring preferences (his cronyism).

24.     Ms. Brice and Ms. Moody retained the outside law firm of Wimberly, Lawson, Wright, Daves, & Jones, PLLC ("Wimberly Lawson") in Cookeville. Wimberly Lawson was selected for its existing relationship with the City for providing employment-related guidance.

25.     Glick was informed to stay off premises during the investigation. He knew—and he deeply resented—Ms. Brice and Ms. Moody initiating the investigation against him. In his mind, "together," they were responsible for coming after him, as if they were doing something wrong. In truth, of course, it was *Glick* who so clearly championed a hiring system arising from cronyism and his own bar-buddy.

### *Wimberly Lawson Determines Glick's Dishonesty, Risk of Retaliation, and Disparate Impact*

26.     Ms. Brice participated in protected activity by sharing with Wimberly Lawson the historical concerns of discrimination through Glick's non-objective standards and his pattern of cronyism. She shared fears of employees of retaliation by Glick, giving examples.

27.     Glick was interviewed too. At the Tullahoma airport, he spoke with Wimberly Lawson's lawyers for approximately four hours. Yet he remained "puzzled" about the Wimberly Lawson investigation. In his mind, he actually thought that he "had answered the questions thoroughly and thought the interview went well."

28.     To the contrary, the Wimberly Lawson interview was a disaster for Glick. Wimberly Lawson found Glick not credible. His responses to retaliation allegations did not add up. Witnesses did not support him. He lied about not having entered the community center on December 1, 2020 during the middle of the night, having been instructed to stay away. And he seemed to not recognize that discrimination can be intentional *or* unintentional, particularly when hiring is based upon cronyism (as he advocated with the Slater situation).

29.     In the course of four hours of speaking to Wimberly Lawson, not once did Glick ever state that Ms. Moody (or Ms. Brice) said to *him* that older white males would not be hired within the City.  Glick just refused to accept that hiring bar buddies or use of cronyism as a hiring practice could create a disparate impact on minorities in City government.

30.     On or about December 18, 2020, Wimberly Lawson issued an 18-page report. It found no "direct evidence" of racial bias like quotable admissions of racial language by Glick. But the findings about his retaliation and his hiring practices not being merit-based were damning.  The report concluded that Glick "*has a history and practice of hiring his friends—regardless of whether his friends happen to be the most qualified candidates for the positions in question.*" And that practice, the lawyers concluded, "creates *a very fertile ground for the perception of racism and/or sexism.*"

31.     Wimberly Lawson highlighted Glick's insistence on hiring his bar-buddy, Slater, as one example, illustrating rather clearly how this "adversely affected" (*disparately impacted*) other minority candidates with whom he lacked a similar relationship. The Wimberly Lawson lawyers found this "very troubling."

### *Discipline of Glick*

32.     In Glick's mind, Ms. Brice and Ms. Moody had set him up. As Glick would later testify, the purpose of hiring Wimberly Lawson was "to have a derogatory investigation about me." As for the Wimberly Lawson lawyers, he said they were just "producing the work product that they were hired to produce." Glick felt Wimberly Lawson was simply a tool of Ms. Brice and Ms. Moody. And that *infuriated him*.

33.     Ms. Moody gave measured and quite lenient discipline to Glick. While she could have fired him based on the Wimberly Lawson report, and *certainly* for violating orders on entering

premises during an investigation (and lying about it), she gave grace due to his tenure and the coddling he had received through the former administrator. Glick was merely suspended, concurrent with a vacation, and was notified that he would be placed on a performance improvement plan.

34.     The draft of the performance improvement plan stated that "[t]he goal in hiring will be to select the most qualified applicant for all positions and to structure hiring practices to eliminate nepotism and personal bias in hiring friends, acquaintances, neighbors, etc."

35.     But Glick remained livid. His hiring practices had been accepted for so many years that, in his mind, he "had not done anything wrong." Of course, it was *undisputed* that Glick was advocating for a less qualified bar-buddy and he did, in fact, lie about coming onto the premises (being ordered not do). But instead of just accepting responsibility for his actions, he blamed Ms. Brice and Ms. Moody. He filed a Charge of Discrimination alleging the refusal to interview his "white, male candidate," Slater, had been *racially* or *sexually* motivated.

36.     Glick would testify that the Wimberly Lawson investigation was just "a weapon *to attack me* for raising questions about discriminatory hiring practices." Of course, those "discriminatory hiring practices" involved Glick trying to hire a person who was not *qualified*— Slater, his white male bar-buddy, who talked sports with him at the Buffalo Wild Wings. Glick refused to accept that Slater was not *qualified* and that other minority candidates could be, and were, *more qualified vocationally*.

37.     With his "older white male grievance," Glick planned to get even with Ms. Brice, Ms. Moody, and anyone else that got in his way.

*The Retaliation*

38.     On or about May 7, 2021, Glick retired from the City of Tullahoma.

39.     On January 13, 2022, Glick filed a lawsuit against the City of Tullahoma wherein he argued that his retirement was an age-related "constructive discharge."[2]

40.     Like his EEOC charge, Glick's lawsuit injected his white race and male gender. It said: "Glick was called into a meeting with the HR Director, Casta Brice, and told that the *white, male* would not be interviewed." (D.E. 1, Complaint, 1:22-cv-00015-CHS, ¶11)(emphasis added).

41.     Glick is not a minority race or minority gender. But in his lawsuit, Glick alleged *for the first time*, even though he was previously interviewed for four hours about discriminatory hiring practices by Wimberly Lawson, that Ms. Moody told him: "[W]e are not going to hire another over 40 white male" and she "made additional age-related statements about older men."

42.     With his lawsuit filed, in August 2022, Glick ran for and obtained a position on the City's Board of Alderpersons.  His election, along with a slate of other alderpersons, changed the dynamics of the City's Board. Now in a position to exert power through an arm of the government, the City itself, Glick set about his plan to get even with Ms. Brice and Ms. Moody. The retaliation that would unfold is staggering in its breadth and cruelty.

43.     On September 12, 2022, in his second public board meeting as alderman, Glick asked for a hearing to address Ms. Moody's "performance issues" and accused her of "fraud."

---

[2]     To be put on a performance improvement plan (which Glick precluded with his retirement) was *not* a discriminatory act. "Such a change usually comes in the form of a termination, reassignment with different responsibilities, failure to promote, or significant change in benefits. *Id.* But Hammond′s performance improvement plan did not result in any of those things. Hammond concedes that the plan did not change his ″pay,″ ″benefits,″ or ″job duties.″ *Hammond v. Sysco Corp.*, 2023 U.S. App. LEXIS 34071, *23-24 (6th Cir. 2023). But that's what the lawsuit claims.

44.     Glick then refused to recuse himself from voting on Ms. Moody's employment status in spite of his lawsuit alleging *she* was responsible for Glick's "constructive discharge."

### *Removal of Ms. Brice's Hiring Duties*

45.     In a January 23, 2023 board meeting, Alderman Glick tried to exclude Ms. Brice from the hiring process of the new City Administrator. His written proposal stated: "*The entire process must take place outside of City of Tullahoma Human Resources Department.*"

46.     In a clear nod to his lawsuit allegations about white males not being interviewed (Slater, his drinking-buddy), his proposal states: "BOMA to review <u>all</u> applications and narrow to a group to be interviewed."

47.     By letter of February 8, 2023, included for discussion in the February 13, 2023 board agenda packet, the Municipal Technical Advisory Service (MTAS) responded firmly to Glick's proposal. It wrote:

> We have concerns that the Human Resources Department is being requested to not be involved. This department is vital to ensuring that your city policies are followed. The HR Director has internal knowledge of policies, procedures, and human resource practices that exceeds what anyone else in the city can provide. I encourage the BOMA to allow her [Ms. Brice] to be involved.

48.     At a board meeting on February 13, 2023, attended by the Municipal Technical Advisory Service representative, Glick said his "amended process" did not match the representative's recommendations. He circulated his "Amended City Administrator Recruitment Process" which, again, specifically *excluded* Ms. Brice as the Human Resources Director and included multiple references to all applicants being considered by the Board.

*"The Big Excuse" to Investigate Ms. Brice— "She Just Gave Us Our Excuse!"*

49.     If taking away her duties were not enough, Glick looked for opportunities to retaliate against Brice by having her *investigated* (as he was). This crystalized on February 1, 2023.

50.     Knowing that Glick was obviously out to fire her, on January 28, 2023, Ms. Brice readied her office for a successor, beginning a long overdue process of clearing out old files. These included documents with confidential employee health information, personally identifiable information (PII), closed files on internal investigations, and other human resources documents.

51.     Ms. Brice did not violate any file-retention or disposal policies of the City.  To the contrary, she reviewed the MTAS policy on "Records Retention Schedule," at "retention period," for various types of documents.   The MTAS policy she reviewed includes requests for accommodations (a period of two years); employment applications (a period of five years); citizenship and authorizations to work such as I-9s (a period of three years); contracts (a period of seven years); termination records (a period of five years).  Ms. Brice made a contemporaneous, handwritten note *on the MTAS Records Retention Schedule itself* on how certain files were to be retained even longer. Thus, there can be no question she was following the process.

52.     Ms. Brice certainly did not shred any active litigation documents (including Glick's litigation). Nor did she violate any confidentiality rules. In fact, she *openly* requested a large-volume bin which would then be sent to a shredding company to ensure confidentiality was maintained. That bin for the documents was openly delivered during business hours.  And when Ms. Brice went through the boxes, she did so openly, during the week, and in accordance with MTAS recommendations.

53.     Acting on a tip from the City Recorder and friend of Glick, Rosemary Golden, Glick assumed Ms. Brice could be destroying evidence *from his own active lawsuit*. But Golden had said no such thing. As Golden herself would testify, she never even *saw* the documents. And none had been shredded. But by this time, Glick had found an ally in fellow alderperson Jenna Amacher. Glick himself said of Amacher: "We're like-minded," and "*[s]he was upset about my termination.*"[3]

54.     Of course, Glick was *not* terminated. Not even the City believed him. The City stated in response to Glick's own lawsuit that Glick "was not terminated, constructively or otherwise, and his employment with the City did not end as a result of any illegal act or omission on the part of the City. [Glick] chose to retire from his position with the City."[4]

55.     Regardless, Amacher *was* upset about his Glick's employment. Even though Amacher owed fiduciary duties to the City as an alderperson, she posted a video on Facebook saying that Glick "should have" filed the lawsuit because he was "done wrong."[5] Amacher stated in her own federal filing against the City of Tullahoma that Glick was a victim of "illegal or unconstitutional treatment."[6]

56.     So on February 1, 2023, at Glick's request, Amacher entered City Hall, already believing, like Glick believed, that Glick was treated illegally. Amacher intended to review certain documents that Ms. Brice had separated to be shredded. She had given no notice nor had she made a Freedom of Information Act request, the normal process.

---

[3]     Again, Glick was not terminated. He submitted his resignation. Glick was alleging that resignation was a "constructive discharge."
[4]     See *Glick v. Tullahoma*, 1:22-cv-00015-CHS, at D.E. 9, Affirmative Defenses, p. 7, ¶7.
[5]     See *Glick v. Tullahoma*, 1:22-cv-00015-CHS, at D.E. 31-2, ¶24.
[6]     See *Amacher v. Tullahoma*, 4:23-cv-00040, at D.E. 1, ¶17 (Complaint).

57. Ms. Brice discovered Amacher in the file closet with the door closed. Surprised, Ms. Brice asked Amacher if she needed help with something. Amacher was on her cell phone, holding a document in her hand, going through the documents sorted to be shredded, when Amacher told Ms. Brice to leave and close the door.

58. Ms. Moody, the City Administrator, was summoned and she, too, asked Amacher what she was looking for. Ms. Amacher informed Ms. Moody and Ms. Brice that she was there to investigate concerns about Human Resources. Ms. Moody explained that concerns regarding department heads should be brought to *her* as the City Administrator and that Amacher does not have an unfettered right to view confidential files simply because she is an alderperson.

59. When Amacher did not leave, other members of the newly constructed Board of Alderpersons were contacted and showed up at City Hall. This included Glick. Eventually, the documents—*none* of them shredded—were entrusted to the City police.

60. In discussing Amacher's closet-viewing of documents, Glick, or one of the other alderpersons, made an audio recording. In this recording, Glick can be heard praising Amacher for finding an "excuse" to investigate Ms. Brice: "That's just the first, that could be the big excuse for saying '*I think we need another investigation into HR. She just gave us our excuse!*"

61. Instead of acknowledging they were *looking* for an "excuse," the Board kept this motivation secret. Even Ms. Amacher had not seen the destruction of *any* documents linked to Glick's lawsuit (or any other documents allegedly disposed of improperly). No one bothered to ask Ms. Brice about the MTAS procedures she was following.

62.     On February 2, 2023, Ms. Moody provided a link to the same MTAS records retention manual which Ms. Brice had reviewed and upon which she made her contemporaneous notation.

63.     It did not matter. By email of February 8, 2023, Ms. Amacher proposed a board agenda for February 13, 2023 that included the City "launching its own independent investigation as well as requesting assistance from the Tennessee Comptroller of the Treasury." They were to "make inquiry" about the documents to be shredded, with Ms. Brice to be put on paid administrative leave "immediately."

64.     And by email of February 10, 2023, Alderperson Bobbie Wilson falsely stated that "it was discovered" that Ms. Brice was "shredding a mass amount of documents."

### *Suspension of Brice*

65.     Sure enough, on February 13, 2023, the City Board used the "excuse" of the file disposal, as the recording of Glick showed, to open an "investigation" of Ms. Brice.  By memorandum of February 21, 2023, the City took an adverse action of placing Ms. Brice on administrative leave with pay "until an investigation of document disposal procedures has been completed."

66.     An investigation should have taken five minutes. The City *had no* "disposal procedures" apart from the MTAS guidance to which Ms. Brice adhered.  Her contemporaneous note shows she was following it. In fact, the Board directed the City Recorder, Rosemary Golden, on the date Ms. Brice was put on leave, to "*bring forth* a qualified record retention plan." Such a plan was presented and adopted by the board on March 27, 2023, some six weeks later.

### *Brice Testifies for the City Against Glick*

67.     On March 29, 2023, still on her administrative leave, Ms. Brice engaged in further protected and oppositional conduct by providing a deposition in Mr. Glick's "constructive discharge" case that he filed against the City of Tullahoma.

68.     With Glick present and listening, Ms. Brice gave testimony clearly adverse to Glick about the issue of *disparate impact* in Glick's Parks and Recreation Department:

> Not having an adverse impact in your recruitment process so that if you are recruiting folks that are primarily your friends, then you adversely impact minorities from being able to be employed. Because if they're not within your circle, then you don't have an opportunity to include them in recruitment.

69.     Ms. Brice articulated in her deposition how Mr. Glick's advocacy for Mr. Slater, plus Glick's clear history of cronyism, presented a serious liability risk to the City:

> Mr. Glick had a history of hiring his friends. Mr. Glick was proposing to include Mr. Slater in the interview process. Based on history where his management staff was involved in the interview process, if they knew who he wanted to hire, then they were likely going to rank and rate that person such that that person would be hired. If that occurred -- and, again, Mr. Glick was proposing this person even to me as a strong candidate.
>
> So based on his emphasis on hiring or considering this person, the likelihood they would be hired over qualified individuals and the perception of the individual who had the most experience being female and the second-rate candidate being a minority, that could have opened up the City to liability if someone is hired who did not have the same work experience, education, and background as per the job posting for the position.

### *"It's Just Sick"*

70.     On May 8, 2023, Alderman Daniel Berry drafted Board Agenda Item No. 23-83 that included an "Ethics Complaint" from citizens in the community. This included an allegation that Ms. Moody and Ms. Brice were "key witnesses" in Alderman Glick's lawsuit and that he was engaged in retaliatory conduct to "influence his current lawsuit."

71.     That same day, May 8, 2023, Alderman Berry addressed the obvious cruelty of leaving Ms. Brice on an indefinite suspension without any evidence of wrongdoing.  He said:

> It's a farce that she is even on leave right now, and it's a farce that we continue. What I was trying to do with this item, and the urgency behind this item, was to give this board the opportunity to do the right thing. At a minimum what we're going to do is get members of this board again not doing the right thing. It's just sick.[7]

72.     It *was* sick. The Board had left Ms. Brice on leave for months without an investigation on an issue of file retention—without the existence of any file retention policy apart from MTAS guidelines.  It was just "*looking*" for an excuse to fire her.

73.     At this May 8, 2023 board meeting, Alderman Berry included an agenda item to "Reinstate Human Resources Director Casta Brice."  When Glick saw it, he angrily went to City Hall and tried to remove it. The Board, with Glick, voted 5-2 to remove the agenda item.

74.     At no time did the City, through its own legal counsel, protect Ms. Brice (or Ms. Moody) from harm nor blow the whistle on Glick's actions to cause them harm.[8]

---

[7]     *Tullahomanews.com*, May 11, 2023.

[8]     Tennessee S. Ct. Rule 8, RPC 1.13, governing lawyers who represent organizational clients, permits lawyers to blow the whistle under these circumstances:

> "(b) If a lawyer for an organization knows that an officer, employee or other person associated with the organization is engaged in action, intends to act or refuses to act in a matter related to the representation that is a violation of a legal obligation to the organization, or a violation of law that reasonably might be imputed to the organization, and that is likely to result in substantial injury to the organization, then the lawyer shall proceed as is reasonably necessary in the best interest of the organization. Unless the lawyer reasonably believes that it is not necessary in the best interest of the organization to do so, the lawyer shall refer the matter to higher authority in the organization, including, if warranted by the circumstances, to the highest authority that can act on behalf of the organization as determined by applicable law.

> (c) If despite the lawyer's efforts in accordance with paragraph (b) the highest authority that can act on behalf of the organization insists upon or fails to address

75.    But the *District Attorney* did.

### *Glick is Indicted*

76.    On or about July 13, 2023, Glick learned that a grand jury had issued an indictment against him. He was charged with official misconduct with intent to obtain a benefit or harm another pursuant to T.C.A. 39-16-402(a)(1) and (3) in Coffee County.

77.    Reacting immediately to his indictment, Glick filed a Charge of Discrimination with the Equal Opportunity Employment Commission stating: "On the morning of July 13, 2023, prior to the start of a judicially ordered mediation, the city of Tullahoma through its attorneys, let it be known that a grand jury indictment had been issued against me."

78.    As he would do, Glick fashioned *himself* the victim as a white man, not as the perpetrator. He claimed that the City telling him of the indictment—"let[ting] it be known"—was an act of retaliation against him.[9]

79.    The next day, July 14, 2023, Glick made an even more outrageous claim. In his federal lawsuit against the City and others, Glick stated that the *indictment itself*, not just informing Glick about it, was an act of retaliation by the City of Tullahoma and/or its agents:

> Plaintiff believes the grand jury indictment may be a separate and additional act of retaliation by Defendant and or its agents against Plaintiff for his objections to hiring practices which were unlawful under the ADEA and Title VII.

---

in a timely and appropriate manner an action, or a refusal to act, that is clearly a violation of law, and is likely to result in substantial injury to the organization, the lawyer may withdraw in accordance with RPC 1.16 and may make such disclosures of information relating to the organization's representation only to the extent permitted to do so by RPCs 1.6 and 4.1."

[9]    Glick's EEOC charge did not mention that the City's so-called act of "letting" Glick know was performed in the most confidential of settings, a judicially required mediation.

(D.E. 46, Case 1:22-cv-00015-CHS). He actually claimed that his indictment itself was an act of retaliation: "Plaintiff filed an EEOC charge on July 13, 2023, against Defendant alleging this new retaliatory action." *Id.*

80.     Referring to the indictment, Glick also advised the United States District Court that "a grand jury had issued an indictment against [Glick] for his alleged actions related to the February 2023 events which have come to be known as 'Shredder-Gate.'" (*Id.*) This was a reference to the February document disposal process, wherein Glick recorded himself saying of Ms. Brice: "She just gave us our excuse!"

81.     In granting a continuance of his trial, Glick's extraordinary charge that he was criminally *indicted* as retaliation was repeated by the United States District Court: "[Glick] believes the grand jury *indictment* may be a separate and additional act of retaliation by Defendant and or its agents against Plaintiff for his objections to hiring practices which were unlawful under the ADEA and Title VII." (D.E. 55, 1:22-CV-00015-CHS)(emphasis added).

82.     The Defendant in Glick's case is the City of Tullahoma. Glick clearly knew the Board of Alderpersons for the City of Tullahoma did not direct the indictment. That leaves "its agents."

83.     Glick had alleged that City "agents," which could include Ms. Brice, the City's defense attorney, the City's litigation defense counsel, or even the Warren County district attorney, may have been *indicting* him because of "his objections to hiring practices." Of course, those hiring practices were the ones involving his own cronyism—where he favored hiring his white drinking-buddy in an already all-white department of full-time employees.

84.     Glick *clearly* needs to be stopped from terrorizing public servants. But the Board is incapable of performing the action because it is comprised of a majority of Glick's enablers. And no lawyers assisted.[10]

85.     What Glick and his enablers refuse to recognize is that Glick is no victim, but a perpetrator of discriminatory hiring practice through cronyism. When confronted with it, by Human Resources, by the City Administrator, by Wimberly Lawson, and now being indicted by the Warren County District Attorney, he becomes indignant, charging good people with grotesquely false allegations, *criminal* activity even.

### Brice is Left on Administrative Leave—A "Waste of Taxpayer Money"

86.     On or about August 8, 2023, District Attorney Christopher R. Stanford advised by letter that his office had not found *any evidence* that would support *any* criminal charges against Ms. Brice.

87.     In August of 2023, Glick, still an Alderman, continued to vote on Ms. Brice's status. He even made or seconded motions to keep her on leave.

88.     In September of 2023, the Board finally voted whether to have an outside law firm review the situation with Ms. Brice and the documents occurring *seven months earlier*. The City attorney, Stephen M. Worsham, had said this was "a waste of taxpayer money" and that local attorneys probably would not be interested. The motion did not pass.

89.     On or about September 28, 2023, City attorney Worsham communicated to Ms. Brice, through her attorney (now judge), Terry A. Fann, that the Board delegated authority to a new City Administrator, Jason Quick, to "make a decision relative to the status of Ms. Brice."

---

[10] See footnote 8.

90.     Ever since February 13, 2023, the City had left Ms. Brice on administrative leave, a period of *nearly eight months* to Mr. Worsham's letter. During this time *all* of Ms. Brice's duties were removed.

### *The City Terminates Ms. Brice's Employment*

91.     Quick issued a letter to Ms. Brice dated September 29, 2023, stating that Resolution 1970 "placed the matter of your employment back into the hands of the City Administrator" and that he had "spent much time reviewing this matter."

92.     Quick claimed to have conducted departmental reviews, to "fully understand the function and responsibilities of *each* department and the leadership within."  He concluded that "several positions have been determined as no longer needed within our organization."  He said these included the vital position of *Human Resources Director* which will "thus be eliminated."

93.     With no prior notification or effort by Mr. Quick to communicate with Ms. Brice about the department, she received the letter from Mr. Quick on Monday, October 2, 2023, notifying her that her position was eliminated as of the previous Friday, September 29, 2023, and that her benefits ended the previous Saturday, September 30, 2023.

94.     After seven and a half months of suspension, with no Board investigation, and no finding of any criminal wrongdoing by the District Attorney, the City had retaliated by creating a pretextual "job elimination" that cost Ms. Brice her livelihood.

95.     This was not a *real* job elimination, as Ms. Brice's Human Resources duties were not, and could not be, eliminated. The City simply eliminated *Ms. Brice*, and transferred her duties

to another human resources person effective September 29, 2023.[11]  This person—who was white and of a different ethnicity—had *not* engaged in protected activity and speech about Glick's discriminatory hiring patterns.  The City then posted a position of Human Resources Clerk to assist Ms. Brice's replacement.

### *Dishonoring Benefit Obligations Unless Brice Signs Away All Legal Rights*

96.     According to alderperson Amacher on Facebook Live on April 26, 2023: "We don't follow the rules. Rules are only enforced when they *want* to be."

97.     The City dishonored obligations set forth in the City of Tullahoma's Personnel Regulations.

98.     Ms. Brice was eligible for the City's Retirement Incentive Plan, set forth at Section 10.4 of the Personnel Regulations.  She was a full-time employee; she was sixty years old [or 55 under grandfather provisions]; she was a regular-full time employee with twenty years of full-time service; and, having been laid off in good standing, she was eligible to elect her benefits under the Retirement Incentive Plan. Once elected, this would provide her continuation of health insurance benefits to be paid by the City of Tullahoma from the City of Tullahoma Medical Health Trust until age 65.

99.     In October of 2023, the City advised Ms. Brice that she could *not* participate in the "Retirement Incentive Plan" unless she signed away all rights to bring any legal action against the City.  There is no requirement in the Personnel Regulations for a release of legal claims for damages

---

[11]     The City's website now lists Lisa Shepherd with the title of "Human Resources." https://www.tullahomatn.gov/directory.aspx?eid=43 (last visited 12.30.2023).

owing to retaliation (or any other legal claim) in order to obtain these benefits. Clearly, this was discriminatory and retaliatory.

100. Upon Ms. Brice's refusal to waive her legal rights, the City sent a final memo on November 1, 2023, stating that Ms. Brice was *not* in good standing. The City took this position in spite of 26 years of service and no investigation of Ms. Brice (which includes her adherence to MTAS policy on document disposal), *much less a finding of violation*. The City denied her participation in the City's retirement incentive plan altogether.

101. At the age of 60, Ms. Brice lost her job paying $100,512 annually, all of her health benefits, *and* significantly decreased her future pension benefits. She has suffered soul-crushing pain and suffering, emotional distress, sleeplessness, trauma, fear, loss of enjoyment of life, and agony from Glick's and the Board's reign of retaliation against her.

## IV. LEGAL CLAIMS

102. The foregoing facts are incorporated.

### COUNT I: SECTION 1981 RACE RETALIATION

103. Section 1981 prohibits racial discrimination in the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship. 42 U.S.C. §1981. Section 1981 extends to retaliation based on race. *CBOCS West, Inc. v. Humphries*, 533 U.S. 442 (2008). Ms. Brice is within the protected class of persons.

104. Defendant engaged in retaliation under 42 U.S.C. §1981 (enforceable through §1983) as described in detail above. But for, and/or *because of*, Plaintiff Brice's good faith complaints and testimony about Glick's hiring practices being unlawful, and her opposition to his hiring

practices, Brice would not have had her duties removed, been suspended, or had her employment terminated by the City.

105.     As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendant is liable.

## COUNT II. FIRST AMENDMENT RETALIATION (42 U.S.C. §1983)

106.     Under the First Amendment and 42 U.S.C. §1983, the Defendant, through persons acting under color of state law with final decision-making authority, engaged in retaliation for Plaintiffs' protected speech about discrimination both internally and by giving her giving a deposition wherein she opposed the discriminatory actions of a City alderman (Glick's lawsuit).

107.     Defendant was deliberately indifferent in its actions.  But for her speech and opposition—*because of* these activities—she would not have had her duties removed, been suspended, or had her employment terminated by the City.

108.     As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendant is liable.

## COUNT III: RACE DISCRIMINATION

109.     The Defendant engaged in race discrimination under 42 U.S.C. §1981 (enforceable through §1983).

110.     But for Plaintiff Brice's race and ethnicity—*because of race/ethnicity*— she would not have had her duties removed, been suspended, or had her employment terminated by the City.

111.    As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendant is liable.

**COUNT IV: Fourteenth Amendment Equal Protection Secured by 42 U.S.C. §1983**

112.    The Equal Protection Clause of the Fourteenth Amendment mandates that "[n]o State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents."

113.    Defendant denied Plaintiff Brice her constitutional right to equal protection of the laws under the Fourteenth Amendment. Defendant violated her federal constitutional rights secured by the 14th amendment to be free from discrimination and retaliation as a result of her race or ethnicity. Additionally, Defendant is liable for the violation of Plaintiff's federal constitutional rights pursuant to 42 U.S.C. §1983 in failing to provide proper supervision and training to prevent the unlawful and discriminatory abuse. The Equal Protection Clause of the Fourteenth Amendment requires "that all persons similarly situated should be treated alike." *City of Cleburne, TX v. Cleburne Learning Center, Inc.*, 473 U.S. 432, 439 (1985).

114.    The City intentionally discriminated against Brice because of her race and ethnicity and replaced her with a white person. As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendant is liable.

## COUNT V: Tennessee Human Rights Act

115.     Plaintiff brings supplemental claims against the City under the THRA, Tenn. Code Ann. §4-21-101 et. seq.  The THRA declares that it is a "discriminatory practice" for an employer to "discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin." Tenn. Code Ann. § 4-21-401(a)(1). Similarly, the THRA prohibits retaliation "*because* such person has opposed a practice declared discriminatory by this chapter or *because* such person has made a charge, filed a complaint, testified, assisted or participated in any manner in any investigation, proceeding or hearing under this chapter."

116.     The City discriminated against Plaintiff Brice by interfering with her employment status, terms, conditions and privileges of employment because of her race/ethnicity, and/or her sex (female), and/or in retaliation for her participation and opposition to discrimination internally and through her testimony. As a direct and proximate result of Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which Defendant is liable.

## V.     REQUEST FOR RELIEF

Wherefore, Plaintiff requests the following relief of the Defendant:

A.     That proper process issue along with a copy of this Complaint requiring Defendant to appear and answer;

B.     A declaration that Defendant has violated federal or state laws, for the reasons outlined above;

C.     Injunctive or equitable relief to preclude post-termination retaliation;

D.    Monetary damages up to five million dollars ($5,000,000) sustained by the

Plaintiff, including but not limited to:

      1.  Lost income including lost wages (front pay and back pay), loss of

          earning capacity, loss of health insurance, payment of COBRA

          coverage, loss of pension or retirement benefits, and any other

          emoluments of employment;

      2.  Extreme damage to her reputation; pain and suffering; and

          humiliation and embarrassment and emotional harm;

E.    Reasonable attorneys' fees and costs; and

F.    Any other legal or equitable relief to which Plaintiff is entitled.

**G.    Plaintiff demands a jury.**

      Respectfully submitted,

      **s/ Justin S. Gilbert**
      GILBERT LAW, PLC
      Justin S. Gilbert (TN BPR No. 017079)
      100 W. Martin Luther King Blvd, Suite 501
      423.756.8203 (T)
      Chattanooga, TN 37402
      justin@schoolandworklaw.com